In addition to the court, I'm Jared O'Keefe for the Palatine Plaintiff Obstetrics and Gynecology LLC. I'd like to reserve three minutes for a while. Today, a counselor standing with me is also Amy O'Keefe, who has worked extensively with me on this matter. And there's no problem. We'll spend three minutes interesting the attorney for any questions on trial. I'm going to address the court's questions that you sent to us, but I'd like to make a few general comments about the case. I was premature for this case to be discussed at the pleading stage because the plaintiffs I have and can't show that they can allege culpable claims. Thematically, the defendants argued that plaintiffs made a bad deal, and that's a great argument if it were true. I'm sure the plaintiffs took on some risk in entering into the land disposition agreement. They took on the risk that the land use requirements in place might change because they didn't enter into a statutory development agreement. They took on the risk that a project may not be done for legitimate environmental concerns, which risk was embodied in Section 2.2 of the contract. However, they considered that a low risk when they entered into the contract. At the time, the Federal Base Closure Act, pursuant to which the city purchased the property for $1, required and mandated the city to use the property and develop it for economic benefit for its residents. In denying Chevron's challenge to the inception of the contract issue, State Court Judge Flynn made the same decision. It was the city that brought upstream to the table and introduced the idea of the casino, and if a casino could not be done due to the tribe's inability to get federal or state approvals, or for legitimate environmental reasons, then the contract required the parties to negotiate in good faith. At a time when the EIR had already been completed so they would know what projects may or may not be feasible, and also at a time when the contract would have required the city to give each alternative project equal consideration so there was a high likelihood that if a casino project could not be done, an alternative project would be done. One risk that plaintiffs did not take on in entering into the contract was the risk that its partner in the contract would halfway through change its mind about going through with the contract and undermine the very intent and purpose of the contract, or the risk that its partner would already predispose its mind not to do the project and would not negotiate in good faith for an alternative project. This appeal asks a very simple threshold question, how do plaintiffs allege sufficient facts to state a claim? In our briefs, we believe we stood on four separate bases to establish breach of contract or breach of covenant in good faith and two separate bases for breach of contract, any one of which would justify serious case allegations of predation on the merits of all six of which we believe are viable. The allegations here, which must be taken as true, in the name of which must be heard through argumentation, do not tell a story of a plaintiff who made a bad deal and is merely grousing over sour grapes. Rather, the record on appeal shows that the plaintiffs have extramarital claims and that this case is replete with questions of fact that cannot be resolved on proceedings. We counted over ten questions of facts raised by the city's brief alone that cannot be resolved at this stage, including these three. The first two are the ultimate questions asked by the claims whether the city acted in bad faith by deciding not to do a project with the plaintiffs before the ERIs were certified, and we believe these show lots of facts. Well, is that bad or what's the ERIs? Well, first of all, my understanding is that the strongest bad faith claims seem to go toward the question of of federal approvals, um, of the frustrations, and by the settlement agreement that only arises after the C-Corp approval, is that right? The obligation of the city to send the letters to support the approvals. To support the approvals. So I would say two things on that. First, the settlement agreement delays that with regard to the LVM so that the city was not under an obligation to affirmatively send letters supporting the approvals until they made a decision as to which project they would or would not want to do. But that did not allow the city to then actively undermine the project by sending letters. But, Jefferson, it all comes back to the C-Corp approval, and I understand the ERIs saying this is not a C-Corp use, but the problem is maybe that it's not a C-Corp use, because if it's a problem, a faith-based problem, it has to do with the C-Corp decision. And, in order to make you do that in a state administrative mandamus, at least in my lab, first of all, you need to go to IPG's state administrative mandamus and say, you know, aside from the administrative record, there was a whole lot of other shenanigans going on here, and there were really bad things, but you've done that in a state administrative mandamus. We could have done that. Why not? And the reason is, if you look at the Mammoth Lakes case, which is ongoing on several issues concerning that issue, if we had gone and petitioned for a writ of mandamus, the only thing we could get from the court is the relief that the resolution that the city issued discontinued our interest in the casino, which itself is not a C-Corp determination, but that that resolution was somehow in violation of a statute and that the city would be required to go back and substantiate, the resolution with substantial evidence. In Mammoth Lakes, the court talks about... And their resolution, they're not in good faith in their overriding, in their considerations, the overriding considerations, and therefore they should, their approval should lose their reason. That's correct. We couldn't do that. Why? Because in a CEQA action, the only thing you can do in a CEQA action That's not true. I mean, in general, in California, I just can't imagine that you can do it in that document, or in various ways, and it's not, I mean, I could take a local claimant in California, I could just say to him, and he would say, this was not a good faith decision. That's correct. In case of the breach of contract, because our claim arises, our good faith claim, we're not saying they didn't follow the CEQA on good faith, we're saying they didn't follow their contract. Okay. It's all CEQA good faith, and it seems to me you're precluded, because then it was not legal to ask the casino if they decided it wouldn't be a negotiation. But as to the casino, you are precluded at that point. We are not precluded, because we can't compel them to do a casino project under CEQA. Right. All we can do, if we had a Matt Davis action, is compel them to do something that the CEQA process requires them to do. And our claim is that they made up their mind before they even got the AIR, so they didn't base their decision. And of course, that'd be a CEQA violation. No, it couldn't be a CEQA violation. What could be a CEQA violation is the opposite. If they made up their mind to do a project, and they committed themselves to do a project before doing the environmental review, and then they went and made an affirmative determination that we're going to do this project, that would be a good challenge. But what they did here is they made no CEQA determination. They haven't said they're going to do a project or not a project. They issued a resolution saying that they're discontinuing consideration of a casino. Then they turned around and used that to say the casino is legally impermissible so that they could keep the deposit to be paid and then trigger negotiation for an alternative. But they never gave the alternative a viable chance. That answers your question. Okay. But why aren't they right at that point? The casino is not legally viable for an invasive CEQA determination stance. Because they didn't make CEQA determinations. They didn't base their decision on CEQA exclusively. They put a whole list of issues of why they didn't want to do a casino. And CEQA was one of them. But our intention in this lawsuit is that we have a contract that required them to act in good faith and support a casino project if it can be supported under CEQA. If not, then we have the right to negotiate an alternative project. We can't compel them to do a project under CEQA. And under CEQA, we can't get the remedies for breach of contract that are available here. In the Mammoth Lakes case, they make a very important distinction that there may be conduct that has a dual nature to it, where certain conduct may violate a statute if it arises from mandamus action, but that same conduct can also be viewed as an executive decision by the city to breach a contract. And you could file a breach of contract action for the same conduct because the relief you're seeking and the primary right you're seeking is different and wouldn't be available in a mandamus action. I hope I've answered your question. And then going back to the other aspect of your question, which is the city's obligation to send letters in support of the tribe's application, that was suspended. But under the covenant of good faith and fair dealing, their conduct of undermining it serves the purpose of trying to scuttle the approvals, especially at a time when our client was not aware that they were doing that, and our client was continuing to pay them for extensions and continue to spend hundreds of hours doing the remediation work and other things to move the product forward. It is breached in the covenant, and there also was a City Council resolution that's in the record, instructing the mayor, vice mayor, and others to write letters to support the project, and the self-settlement agreement did not set that aside. So we believe that just because the self-settlement agreement delayed that conduct by the city until it made a decision, it didn't allow them to undermine the contract, nor did it abrogate their obligation under the particular City Council ordinance, City Council resolution that also had made a similar instruction. I'd like to touch on what the 9th Circuit said about the city's abuse of governmental power to avoid contractual obligations. It's an offshoot of this issue of the mandamus, but it particularly associates versus the United States in 261, 3d, 870. This court held that governmental powers should not be used to enact legislation to prevent enforcement of private contractors, and in holding, the court stated that would be akin to giving government as contractor powers that the private parties lacked, and such a result would not be countenanced because the government in its private contracting capacity, which is what we have in this case, cannot exercise sovereign power for the purpose of altering, modifying, obstructing, or violating the particular contracts into which it had entered with private parties. And the logical extension of Kimberly is that the governmental entity cannot declare its own contract illegal to evade its obligations to a private party, and that's exactly what the city was trying to do by using its resolution to discontinue consideration of a casino to try to testify to keeping the deposit and terminating the LDA. I think this is also a good time for me to address, which is where I left off some of the questions in fact, but there's one in particular I would like to address, which is the city has, throughout its brief, contended that their resolution discontinuing consideration of the casino was in fact a secret determination, and that goes to the heart of your question, Your Honor. They're wrong about that. The certification of the EIR was a secret determination. We could have challenged that if we thought there was something wrong with the process of certification. I thought under California law, and I could be wrong about this, that unlike federal law, there is a substantive element to CEQA such that one challenges under CEQA the determination of overriding considerations in either direction under CEQA. Is that wrong? They did not issue a statement of overriding considerations, so there was not a challenge, and we can't force them to do a statement of overriding considerations where they haven't declared that they're going to do a project. If they made a decision that they were going to do a project and the EIR had identified adverse medical impacts, then yes, we could file a written... I thought what happened here, and then I mentioned that the determinants, was that they determined that there were environmental problems and then also determined that there were no overriding reasons to overcome the environmental reasons. Is that not right? There was a second step. No, they did not do that. So what happened here was they conducted an EIR that listed seven projects, three of which were casino-based and the three others were mixed-use-based homes and commercial property, and one was the no-project alternative. All seven of them, including the no-project alternative, had environmental impacts that if they had made an actual CEQA determination and issued a notice of determination, they would have had to issue a statement of overriding facts or conducted some type of commission to identify what they wanted to select after doing that. They didn't do that, and that's why we believe we have a very clear record of bad faith that's very similar to what happened at Mammoth Lakes but significantly more facts. So I have exhausted a lot of the time, and I want to know if there's something in particular you'd like me to talk about before my time is up. This whole document, resolution number 23-11, you say it's not a determination of overriding considerations. It was proposed to be overriding considerations. That's correct. That's correct. That is their, what we believe is their executive decision to justify terminating the contract, but it's not a mistake of overriding consideration under CEQA. And if you look at the first two factors that they list in there, they list the failure of the, they list the delay in the Bureau of Indian Affairs issuing their land determination for the tribe as their first and second in the opposition by the senators, and the reason why we think that's important is because the city, while it was at an obligation of good faith, as well as express provisions in the contract to support this contract that they entered into and received so much benefit, were behind the scenes lobbying against it, and then they cite the efforts of the undermining lobbying as their first two reasons for not approving the LDA, and that has nothing to do with the environmental review. They didn't identify and discuss all of the options under DIR as they were required to do when they made the decision to discontinue the casino use. They didn't list unfettered discretion as a reason. And if they really thought that they could do anything, which has essentially been their argument, then why would they go through the trouble to create this pretext of environmental concerns? And my last thing is kind of with regard to the, what I do see to be slides right now, i.e. the alternative project negotiation. Yes, ma'am. Your complaint doesn't say much. Do you make a motion to amend the complaint? We made a motion to amend the complaint, and that was the final motion that we made, and the court denied it. The fourth amended complaint, which is in the record, I think, starting at ER 40, right around there, has very extensive allegations, and our brief discusses it extensively. And really the question there is, did they engage in surface bargaining, which is not really ever giving the alternative project a chance, or did they engage in hard bargaining, which is fair, fair bargaining, but is hard and confusing? We've lined up the allegations in our fourth amended complaint with a whole number of cases that make it very clear that we have alleged the types of facts that support those. Do you see anything? Okay, thank you. Go ahead. Mr. Chief, please support Scott Crowell on behalf of the Kennedy Village Area. Since I only have three minutes, I want to focus right in on the attorneys' case issues, and the court has a question. The question that the court asked, which is which claims in the third amended complaint were authorized by the tribe. The tribe did not authorize a waiver of immunity, as did any of the claims. The tribe authorized the lawsuit, but that authorization did not include any immunity waiver, and the tribe has very clear laws within its constitution. So if you bring a lawsuit, would you be immune from costs in a case when you bring a case? No, in fact, we pay the cost. Right, well, twice, same thing. Excuse me a minute. Okay. Are you arguing that you're not bound by the state law and the contract attorney's fees provision? I mean, I understand in general that if you have sovereign immunity, if you're bound by a contract, then you can't necessarily be sued over for infringement. Right? If you're bound by a contract, that's not a waiver of the right to have sovereign immunity, it's to be sued over. Correct. Well, if you're bound by a contract and there's no waiver of immunity, you cannot be sued over. Right, that's what I just said. Okay. So I understand that much, but if the contract says if you bring a lawsuit, then that's why you're saying that by bringing a lawsuit, there's no waiver of immunity. The basis for the court to award attorney's fees was based on the breach of contract claim and the prayer for relief. It's not based on any statutory authority of the court. I thought it was also formally stated in the California statute that if there is a provision in a contract that is binding, then it is an important fee. It's just something like that. But I don't know what that matters. Unless you're arguing that you're not bound by the attorney's fees provision at all, meaning the size of sovereign immunity, I don't see what your argument is. The tribe is not bound by the provisions on the contract that provide for an award of attorney's fees. That would be primitive relief back against the tribe as a result of it. I'm not asking you to do it. I'm asking you to leave aside the sovereign immunity question. Okay. That's a third-party beneficiary to this contract, which seems to say if you bring a lawsuit and you lose, whoever you are, you have to pay fees. Does it say that? The contract says that. Right. Okay. So you brought the country, you brought the lawsuit, and you lost. You agree that you have to pay costs, but is this just an automatic consequence of losing a lawsuit? Right. No, because there is a statutory basis for the award of costs separate from the basis for the sovereign immunity. It's because it's, you know, what if there were sanctions against you? What if you brought a lawsuit and it's just a part of what they're called sanctions against you? That would be based on the inherent jurisdiction of the court and not based on the contract. Right. Okay. So why isn't this the same thing when you're suing on a contract that says, and if you lose, you have to pay fees, and you brought the lawsuit? Is it an automatic consequence of you having filed the lawsuit? Well, it's so different than breaching any other provision of a contract. Why? You can breach anything you can breach. It's not a breach. It's just if you bring the lawsuit and you lose, you have to pay the fees. Is there an alternative way you can breach treason? No. I think the law is very clear that there can be a permanent relief against the tribe absent a clear and unmistakable waiver. The question is whether it's a permanent relief. If costs are not a permanent relief and sanctions are not a permanent relief, why isn't the payment of fees in it with regards with the contract that says, if you lose, you pay fees, affirmative relief, as opposed to simply the consequence of having lost the lawsuit? Because the source of their saying that we're entitled to attorneys' fees is a provision of the contract. And the tribe, when it entered into the contract, did not waive its immunity for any affirmative relief back against the tribe. I understand. The contract said if you take X, Y, and Z, you're going to pay $1,000. If you take X, Y, and Z and you're going to syndicate and collect $1,000 from me, of course, that's affirmative relief. That's right. And the fact in that case has been resolved. It has been litigated over and over again. A tribe bringing a contract, bringing a contract claim, does not subject it to any counterclaims being brought based on those same theories. It may be, on one level, unfair. That's the nature of sovereign immunity. It often results in unfair results. But the Supreme Court has made it clear that if you bring a contract claim, even if there's legitimate counterclaims being brought against you, they can't recover affirmatively against the tribe. They can recover recoupment. But that's the extent of their recovery. And that case law is very clear. Okay. Your time stops. Thank you very much for your argument. Thank you, Your Honor. Justin Palmer here on behalf of the city of Richmond. You're doing a great job. I am. I'm not going to claim your fail-suits for entirely individual reasons. First, the LDA and the settlement agreement equivocally and expressly gave the city discretion not to go forward with the casino. Well, sometimes that seems like an overreach to me. For example, suppose the city had said, we're not going to go forward because we've got a better offer. We want somebody else to do the casino. Somebody just came in and said they're going to do this for much less money and they're going to make a nicer home channel, so that's what we're doing. Well, that's, of course, not what happened here. I understand that. That's what a hypothetical is for. After the Seaboard review process. No, before the Seaboard review process. They don't want to do it. There was a standing element here that the LDA said a final determination would be made after the Seaboard process. After the Seaboard process, they said, this is supposed to be a Seaboard process. It's going to be about the opposite way. And they said, you know what? I understand they could do this perfectly, but we don't want to do it. And that would be within the language of the contract. It was quite express. Yes, it was quite express. Okay. I'd like to direct you, of course, the LDA says no final determination shall be made until after Seaboard. And if you include no project, but then this is made crystal clear at ER395. This is the settlement agreement. And counsel for upstream of this brief I hear today is duties be avoided dealing with the actual text of this provision because it couldn't be clearer. So if you look at 1A, and this is at the bottom of ER395, since the city retains its discretion, this is like any alternative use or non-use of the Coimbatore site. That was open to it before approval and execution of the LDA. It had the same discretion the day after it entered into the LDA as it had the day before it signed the LDA. The last sentence by Paragraphs says, the LDA in no way restricts this discretion. Yes, that's right. And it's true. It's one illusory contract. And I understand your argument is that they were trying themselves down for some period of time, but it was useful to them. Absolutely not, Your Honor.  It was an option to purchase if the seller decided to sell. Your Honor is... Your proposition is they don't have an option to purchase if they decide to sell because they decide to sell to somebody else. Not during the period of exclusivity. They paid for a period of exclusivity, and they got exactly that. The LDA called the deposits. A period of exclusivity, right? It was extended several times. That's what the amendments were doing. For the day that the CEQA, to take my hypothetical, the day the CEQA decision was made, they didn't run out? No. Yes, because... Why didn't it run out? Because the term had been extended several times, and then the term expired, and then they triggered... It expired when? I'm sorry. It didn't expire until, and that's why there was a post-CEQA obligation still, was because they hadn't run out. Right, but the period of exclusivity, and that meant that the city couldn't contract with someone else to build a casino on the site, or dispose of the excess... So the LDA had not run out. And they never breached that. There was no allegation that they breached those. So the LDA has tried to express that the deposits that were paid were a non-refundable consideration for this period of exclusivity, and that the city had made no decision about whether they were for or against the project. And that was because the CEQA decided not to go forward with the project. The period was still a period of exploiting, not a period of exclusivity. Um, I think... Actually, otherwise the post-Ukrainian negotiation wouldn't have been an event. Right. There was still an obligation to engage... Because the Ukrainian recovery wasn't out for you. That's correct. That triggered the union negotiating good faith. Oh, I know. Well, it has to be true. Because if they clicked a W, you said, they could have just got it. Not until after the period for discussion of alternative proposals had ended. At that point, the LDA went away, and the city was... I mean, it had an obligation of some kind to exercise discretion in accordance with some of the CEQA constitutions during a period of exclusivity. Right, but they had full discretion to decide not to go forward with a concessional project and not to go forward with any of the alternative proposals. And that was required by CEQA, Your Honor. The LDA, in our position, has made this quite clear, that the city retained its full non-offender discretion. But then the city was sued, and upstream was sued, by environmental groups who said, you violated CEQA by entering into this LDA because you have, in effect, committed to this project. And as Your Honor knows, CEQA prevents a decision-maker from doing that, from committing to a project, not just as a formal matter, but even as a practical matter, before going through the CEQA process. So in order to settle that litigation, the city and upstream signed this settlement agreement, making absolutely crystal clear that the city retained full discretion to either go forward with a concessional project or not, to go forward with alternative proposals or not. And that was discretion that was required by CEQA. And this touches on, Your Honor, brought up the separate part of the settlement agreement that involved discussions with federal officials in the federal permitting process, because that was another provision that was required by CEQA. California state law is clear in the Safe-Tara case that we cite and others that if the city is going on record in advocating for a project before it's gone through the CEQA process, that can create bureaucratic and practical momentum toward the project. The argument here is that they were advocating against it in that direction. Correct. Why is that a problem? That's not a problem because it was the mayor and city council members basically writing letters to federal officials, stating their views on whether a concessional project was a good idea or not. If the city had discretion to decide that, and it did as a matter of contract and CEQA law, then they had to be able to discuss it. They had to be able to express themselves. If the implied covenant were used to impose kind of a gag order that only proponents of the project could speak, but opponents could not, that would violate CEQA because it would deprive the city of the discretionary process and the discretion had to be exercised, and the decision couldn't be made before the CEQA determination had been wrong. I don't understand. I don't know if you have any reaction to the mayor or anything like that. Well, I do divide in the sense, Your Honor, that she wasn't acting in a corporate capacity. She wasn't able to write a letter. I mean, she certainly wasn't able to talk to him. It's her official actions. She wasn't representing the city as a corporate. She wasn't in a corporate capacity. She wasn't seeing the city council tax looted, and it doesn't want you to proceed. Well, she speaks for herself as a mayor. I'm not going to dispute that. But, again, there's no provision in the contract prohibiting individual city council members or the mayor from speaking out. Well, a couple points on that, Judge. One is it's an implied covenant. It can only be used to further the purposes of the contract here. One of the purposes of the contract was to comply with CEQA, and that required that the city receive full discretion. Full discretion requires full discussion by both sides of the debate. But, second. It had discretion to, yes, to give you insight into the project, and this is the same agreement that says that that was one of the alternatives, right, to do nothing. That was one of the alternatives. So, it had full discretion before and after it entered into the LDA. Well, that's true, perhaps, as a matter of CEQA law. So, as a matter of contract, there can be no contract claim based on the city's exercise of its express discretion. In California, it's just that. Well, if there were a claim like that, that would be a CEQA claim. And I want to disagree with my friend on the other side when he says the city's resolution was not a CEQA determination. It quite clearly was, if you look at the record 479, paragraph 16, the city acknowledges that because the environmental impact report had found significant and unmitigatable environmental effects on both traffic and use of park resources, that the project could only proceed if the city were to adopt a statement of a variety of considerations. And the city said, because we determined that the costs outweigh the benefits, we cannot find the benefits outweigh the costs. We are not issuing such a statement. Well, one of the considerations in this charge measure is delaying the federal approvals. And, as I said, this warrant seems to be in a strong position. The warrant would be issued by faith and fair dealings, which is required under the federal approvals. So it seems certain to me in the sense that the settlement agreement says that the federal approvals are supposed to take place only after the CEQA determination. But if this is part of the CEQA determination, it was taking into account the lack of federal approvals. Well, Your Honor, I have a couple points about that. First of all, most fundamentally, there's no harm alleged from the denial of the federal approvals separate and apart from the decision of the city. The harm that was taken into account is the reason for not finding a variety of considerations. Your Honor, there were nine or 10 different reasons. They were each called separate and independent. There were multiple independent grounds for the decision, so that the fact that the city cited a lack of federal approval was not at all dispositive. It was immaterial. At page 66 of the blue brief, the columns acknowledge that they had no accrued contract claims until the city decided not to go forward with the CEQA. Federal approval was necessary for going forward, but it was absolutely not sufficient, and the city recited reason after reason, separate and apart from federal approval. Why didn't you want to go forward? Because there was political opposition at the federal level, which is also the result of the sale. I mean, to some degree. No, but there also is incompatible use of the floor line. Socioeconomic problems caused by a casino increases your crime. Your Honor, is it true, and where do you get that this was part of the secret information? Yes, it's ER 479, paragraph 16. And there are other references to CEQA throughout. This was a CEQA determination, and absolutely they could have gone to court and challenged it and filed a writ as the mission hoax. So they have challenged it on a mandate basis? They could have said yes. Well, yes, they could, and it doesn't really matter. If you look at the mission hoax, what the mission hoax court said, where it found that judicial exhaustion barred a civil court action for fraud by a developer who wanted to develop a piece of land in many ways was parallel to our situation here. The environmental impact report came back negative, and they didn't go forward. Rather than filing a writ to challenge that, he filed a civil fraud claim for damages, and he said, you predetermined the CEQA process. It was a sham, very similar to what we have here. And the court in mission hoax said, that's barred because you didn't file a writ. And if you filed a writ, you could bring a bunch of evidence in outside the administrative right, right? So she's thinking here. I mean, there may have been ways for them to do that, but whether or not that's possible, it's clear as a matter of California law, mission hoax, Westlake, that that was the route they had to take. And there are arguments that they make either here that are classic CEQA arguments. If you look at page 36 of their brief, they recount the city's finding that the CEO had been incompatible with the city's vision for shoreline, Point Malawi. And appellants in their blue brief quote letters from the Sierra Club saying, oh, no, it's actually totally compatible. Look, it's environment may have advantages. Those were letters sent to the city as part of the city's decision-making process. That's absolutely a claim they could have made. And by filing a writ, having not made that claim, the city's good faith statement as to why it decided not to go forward with a casino stands unrebutted and unrebuttable. And, moreover, the project could not let them go forward because the city did not adopt a statement of overriding considerations. That's what one requires. There's a causation problem here as well. So that really is the independent ground for finding the claim barred. But the most more fundamental ground is that the contract language itself precludes importing the implied covenant of good faith. The California law is quite clear. All of them, third story, are the cases that we rely on in our brief. And I would refer the court to that when you have an express grant of discretion, the implied covenant doesn't apply. Unless, as we talked about earlier, the contract would otherwise be in the street. So those are both cases where there were claims similar to this, where there were licensing cases where the party with the power to license could do so at its own election or as it saw fit. And if it did so, the owner of the license would get a percentage. And in both cases, it assumes you're not licensing, you're refusing to license this for invalid back faith reasons. And what the court says in both, and in third story, is that the implied covenant has to be placed in this house because you have an express contractual grant of discretion. And that's exactly what this is fearing. Right. What about the faith unionization situation? Sure. So this was dismissed on straightforward and called Twombly grounds. Right. Because I think there might have been complaints about that. Right. So I would like to address the amendment of the complaint. But there were only two paragraphs in the third amended complaint, which is the operative complaint here. And on this, they were entirely conclusory. Those are in 646 and 657 of the actual record. They included no factual support at all. They plainly failed to stand the claim. So then after the case was dismissed, the owner came in and said, we want to file our fourth amended complaint. This was after the city had already filed three motions for judgment on a pleading. The district court had had this case for years and years. And they wanted to file a fourth amended complaint with allegations about this negotiation process, both for alternative proposals, and generally letters and emails to the appellants, things they had known about for years. And the district court said, no, basically enough is enough. We're not going to have a fourth amended complaint here. And in any event, just to be suitable, because all this shows is that there was a back and forth. There was hard bargaining. And there was no agreement. And the law is quite clear that this kind of obligation to enter into good faith negotiations embodies absolutely no requirement that an agreement be reached. And I will defer to the court in a second. It's true that there is a, I understand you, Your Honor, we're not interested in the EIRB law, but there's a lot of law about it in that context, which does give some hints to what a good faith negotiation is. I think that context is completely different, Your Honor, because that reflects a statutory provision required in good faith negotiations. But there's a contractual provision. Well, there's a statutory provision. It's meant to protect the right to collective bargaining as a whole. Okay. Well, Your Honor, this is totally different, because, in fact, until recently, many courts held that these kinds of contractual agreements to negotiate weren't even enforceable. There's not a lot of law on what content is, how one would even evaluate such a claim. But the best text of such an action is the Seventh Circuit's decision, and I'm not going to pronounce it correctly, but it's like a public heurist that we cite in our brief, which basically says, emphasizes there's no obligation to agree. Things that might run out. There isn't an obligation to agree, but there may be an obligation to put forward proposals or to respond to critique proposals or to do something other than sit there. Well, there's no law that I'm aware of that it would impose as a matter of, that it's a contractual matter, any of those kinds of obligations. It's a contractual system. How is it negotiating? It's not a negotiation scheme. You're not going to sit there. No, there's no requirement. There's no requirement. This contract specifies that if we propose A, you're going to propose B, that you have to negotiate. So if you sit there, I really thought you were going to say, I just don't think you did. But if they just sat there and said, okay, I'm here for two hours, and you sit there and don't say anything, come back for two hours next week, and you sit there and don't say anything, I presume it's not negotiating. Because they asked, what makes it not negotiating? Well, that might not be enough. So the apothecary's case says that we're announcing the obligation to negotiate or abandoning the negotiation. So you're sitting there the whole time and just not doing anything? Well, perhaps that's, of course, not the allegation here. And I would invite the court to actually look at it. No, I mean, if you look at the e-mails. I mean, that's the complaint. But if you actually look at the things they wanted to add before the amendment complaint, the e-mails, the letters, they went back and forth. They are absolutely not defundable that Your Honor is proposing. There was substantive back and forth. No agreement was reached. But that's not the same as saying that the claim was futile. I'm sorry, that's not the same as saying that there was a violation. And therefore, the amendment was futile. I certainly haven't shown that this Court abused its discretion in declaring a leave to appeal. I see my red lights on. I haven't talked about the fees issue at all. My actions are at your discretion, Your Honor. Okay. I think that this is really a question of straightforward contract law. And the tribe sued to enforce this contract as a third-party beneficiary. It walked in in its own phrase to the rights and obligations of the contract. And one of the obligations was the specific dispute resolution. I mean, that's not so general, as I understand it, with regards to sovereign immunity. I mean, that is, if the contract said, you know, not only is that the tribe was supposed to do X, we know that a counterclaim is still subject to sovereign immunity. So it really has to do with not so much that it's a consequence of what the law said under the contract, right? It's not just because it's an obligation under the contract, it's because it's a particular obligation. That's right. So C&L Enterprises talks about the kind of dispute resolution aspects of the contract. And that's what we're talking about here. So what we're not talking about is, Your Honor, is proposing some substantive obligations of the parties. This is a much narrower issue involving the dispute resolution provisions. And when the tribe sued, it walked into those resolutions, it walked into those provisions, it walked into a California choice of law provision, it walked into an attorney's fees provision, and it acknowledged that that fee provision applied because it itself sought fees. And so I think just as a matter of straightforward third-party beneficiary law, they became subject to that dispute resolution obligation. Okay. Thank you very much, Mr. General. Do you need help on that? I don't know. I'll give it to you. Okay. Thank you. I'll be as brief as I can. I'd like to address some things that were said that we believe are wrong, and I'd like to address the case law, which doesn't apply. First, the resolution is definitely not a CEQA decision to do a no project. If they had selected a no project, the EIR had environmental impacts because the property, the dilapidated Hawaiian Human District, is contaminated with asbestos lead. So the only way they could select no project is if they did issue a statement of overriding consideration, which they didn't do. The reason they didn't do it is it would have violated the federal mandate to have a officially selected a no project alternative. You mean the federal mandate was regarded as getting the claim on my new social network? Regarding the only reason they got this property for a dollar was  And I got a little tongue-tied, but the way a statement of overriding consideration is working, we got a little backwards. But if they decide to do nothing, they don't need to issue a statement of overriding considerations. They only do it if the ERI says, here are environmental reasons why you cannot do the project. And then they say, we're going to do a project. And then in the middle comes a statement of overriding considerations saying the reason you're doing the project is because we think the benefits of the project. You don't even make a statement of overriding considerations you're already getting. You do. I think that's correct. It's only when you want to do a project that something's been identified that under CEQA needs to be addressed. We have a CEQA case that says, for example, you could write a wrong one. If they had done that, who would you have? Say, well, you were supposed to consider whether or not to override considerations because CEQA requires you to do that. CEQA doesn't require you to do that if there's a negative decision. That's correct. There's no CEQA case like that. CEQA doesn't work like that. If no one challenges something under CEQA, it's automatically deemed to comply with CEQA. Well, I was just going to add, certainly if the administrator is going to have challenged you on the ground that there were overriding considerations, that they should have considered it then. You can challenge a statement of overriding considerations. I'll say in the absence of a statement of overriding considerations, I'll say it's not challenged. But what you would be challenging is you'd be challenging their determination to do a project under CEQA, and you have to issue a notice of determination. I think they decided not to do the project because they decided to throw a negative environmental consequence. That's correct. And what we're saying is they have no obligation to consider whether they should do it anyway. If they were going to officially make that selection under CEQA, they would have had to issue a notice of determination, and they would have had to make that determination after a hearing where they've taken evidence. And that didn't happen in this case. All the resolution says is they've discontinued CEQA. It doesn't say they've adopted a project alternative under the EIR, so they didn't make that official decision. So I hope that's answered your question. I don't want to cut you short, but I do want to get in front of you and do the question of what harm came up from the conduct to undermine the applications. The harm in this case is wonderfully clear because the federal government had issued and announced an ILG determination in favor of the trial, and it was only drafted and announced. And we've actually produced this, and we've read it, and it's a long, detailed discussion, and now it may be the subject of future action with the court, and it's a privilege. But it is out there. We knew about it. It was in our pleading before we got to this hearing. We let this CEQA decision question fact. He referred to the contract as an option to purchase. Not true. An option to purchase. The person who is the potential buyer pays the owner of the land, and they control whether they're going to purchase it. That's not what happened here. Here we paid not for the exclusivity of paying for and maintaining their property. We paid for their good faith to potentially bring around our right to purchase. But we didn't control, my clients didn't control, the ability to purchase that property. They didn't have the power to say, you can't sell it to someone else because I have an option. That's not what this was. He said that the Wolf and Third Story cases apply. They're completely irrelevant on the issue of discretion, because Wolf and Third Story involved artists who sold their intellectual property to Sony and Disney, and they were hoping Sony and Disney would promote them so their careers would blossom. Ten years before it said, no, they paid you for the right to do whatever they want with materials you sold. It has nothing to do with the discretion issue in this case. Mishnopes does not apply to this case. In fact, it shows exactly why this is not a case that's subject to writ. In Mishnopes, there was a developer who submitted a permit for subdivision, and in connection with that, he had to have an EIR done before the city would approve or not approve the subdivision. He entered into a statutory fee agreement requiring him to pay for the EIR, but he had no agreement with the city. So he was obligated to pay for the EIR. They selected nine consultants. They made available nine consultants. One was selected to do the environmental work. The EIR came back and it had a bunch of adverse impacts, and the city said we're not going to issue you subdivision payment because we're relying on this consultant. This guy then sued the city. So the developer there sued the city, and the person that did it, the company that did the EIR, and alleged that the EIR was a sham, and the court said they don't owe you a duty, neither the city nor the EIR consultants, and you had to bring that claim because you're attacking the EIR. But we're not attacking the EIR. We're asking for our rights under the contract. Thank you. Thank you very much, Larry. All of you for a very useful report. It's a very interesting and useful case. We have already shared your cases for subdivision. We are in recess. Thank you.
judges: Gould, Berzon, Garbis